# IN THE CIRCUIT COURT OF GARLAND COUNTY, ARKANSAS
## ___II___ DIVISION

**RACHEL (JOHNSON) WAGES**

VS.                    Case No. *CU2011-760*

**STATE FARM LIFE INSURANCE COMPANY;**
**STATE FARM ANNUITY AND LIFE INSURANCE COMPANY;**
**STATE FARM MUTUAL AUTOMOBILE INSURANCE**
**COMPANY;**
**STATE FARM BANK, F.S.B.; and**
**JOHN OR JANE DOE, as administrator or administratrix of the**
**estate of TIMOTHY WALLEY (aka TIM WALLEY)**

FILED

2011 JUL 22 PM 2 12

GARLAND CIRCUIT CLERK

BY _____

**PLAINTIFF**

**DEFENDANTS**

## COMPLAINT FOR FRAUD

Comes now the Plaintiff, Rachel (Johnson) Wages, by and through her attorneys, Taylor & Taylor Law Firm, P.A., and for her Complaint for Fraud does state:

### Venue and Jurisdiction

1.     Plaintiff is a resident of Hot Springs, Arkansas. Because this is an action for fraud, venue is proper pursuant to Arkansas Code Annotated Section 16-60-113(b)(1). Subject matter jurisdiction is proper pursuant to Arkansas Code Annotated Section 16-13-201(a).

2.     Defendants State Farm Life Insurance Company ("State Farm Life"), State Farm Annuity and Life Insurance Company ("State Farm Annuity"), State Farm Mutual Automobile Insurance Company ("State Farm Auto"), and State Farm Bank, F.S.B. ("State Farm Bank") are foreign corporations authorized and/or licensed to do business in Arkansas. Therefore, personal jurisdiction is proper pursuant to Arkansas Code Annotated Section 16-4-101(B).

3.     Upon information and belief, Timothy Walley was an Alabama resident who died on or about June 11, 2011. At the time of the allegations complained of in this complaint, Mr. Walley was a resident of Arkansas. Therefore, personal jurisdiction is proper pursuant to Arkansas Code Annotated Section 16-4-101(B).

## General Allegations of Fact

4.    On July 8, 2005, Ms. Wages's father, Marcus Leon Johnson, died.

5.    Prior to his death, Mr. Johnson had purchased a life insurance policy from State Farm Life and/or State Farm Annuity.

6.    Mr. Johnson purchased this insurance policy through Mr. Walley, an insurance agent for State Farm Life.

7.    Mr. Walley and Mr. Johnson had been friends for a number of years.

8.    Upon Mr. Johnson's death, the policy paid approximately $360,000.00

9.    Ms. Wages's share of the policy was $120,000.00.

10.    Approximately two days after Mr. Johnson's death, Mr. Walley visited the Johnson home to meet with the Johnson family.

11.    Ms. Wages was nineteen years old at the time.

12.    At that meeting, Mr. Walley advised Ms. Wages to invest $50,000.00 into a savings account with Defendant State Farm Bank.

13.    Mr. Walley advised that the account would pay seven-percent interest.

14.    Ms. Wages agreed to deposit $50,000.00 of her share of the life insurance proceeds in the savings account that Mr. Walley suggested.

15.    On or about August 3, 2005, Ms. Wages wrote a check in the amount of $50,000.

16.    Mr. Walley instructed Ms. Wages to leave the "Pay to the Order of" line of the check blank.

17.    Mr. Walley told Ms. Wages that he would complete the "Pay to the Order of" line when he returned to the office.

18.     At some point, Mr. Walley wrote his name in the "Pay to the Order of" blank. *See* Exhibit A.

19.     Prior to this time, Ms. Wages had purchased an automobile insurance policy from Defendant State Farm Auto.

20.     Mr. Walley was an agent for Defendant State Farm Auto.

21.     Ms. Wages had purchased her automobile insurance policy through Mr. Walley.

22.     Ms. Wages instructed Mr. Walley to pay insurance premiums for the auto policy from the savings account that she believed had been set up through State Farm Bank.

23.     These were the only debits that Ms. Wages authorized Mr. Walley to make from the savings account that she believed had been set up through State Farm Bank.

24.     Upon information and belief, Ms. Wages's premiums were not paid and her automobile insurance was allowed to lapse.

25.     State Farm Bank describes itself as "a nontraditional financial institution [that] doesn't have branch offices." *See* Exhibit B.

26.     State Farm Bank acknowledges that "[t]he bulk of direct customer interaction and product assistance is provided by State Farm Agents." *See id.*

27.     Ms. Wages did not receive statements in the mail, but rather relied on periodic updates from Mr. Walley as to her account balance.

28.     In January of 2008, Ms. Wages informed Mr. Walley that she needed to withdraw $500 from her State Farm Bank savings account to purchase textbooks for college.

29.     Mr. Walley deposited $500.00 directly into Ms. Wages's bank account at Regions Bank.

30.     Because Mr. Walley deposited the check directly into Ms. Wages's bank account, she did not see the check at the time.

31.     In December of 2008, Mr. Johnson informed Mr. Walley that she needed to withdraw $1,000.00 from her State Farm Bank savings account in order to make a down payment on a home.

32.     Mr. Walley deposited $1,000.00 directly into Ms. Wages's bank account at Regions Bank.

33.     Because Mr. Walley deposited the check directly into Ms. Wages's bank account, she did not see the check at the time.

34.     Several days after Mr. Walley deposited the check, the check was returned for insufficient funds.

35.     At this time, Ms. Wages became concerned regarding the status of her State Farm Bank savings account.

36.     Ms. Wages then called State Farm Bank's customer service line, and was advised that her savings account had been closed in 2005.

37.     As a result of Mr. Walley's actions with respect to Ms. Wages's account, Mr. Walley's license to sell insurance was revoked on May 13, 2010. *See* Exhibit C, page 5, ¶ 5.b.

38.     Defendants have acknowledged that "[c]hecks were written on the State Farm Bank Benefits Management Account of Rachel Johnson and made payable to [Mr. Walley] for $50,000 on August 3, 2005." *See id.*

## DAMAGES

39.     The allegations contained in the preceding paragraphs are incorporated herein.

40.     Mr. Walley stole $49,500 from Ms. Wages ($50,000 total less the $500 check he deposited in her account).

41.     As a result of the conversion of funds, Ms. Wages's college education has been delayed by a period of at least one year due to her inability to obtain funds to pursue her degree.

## FIRST CAUSE OF ACTION – FRAUD

42.     The allegations contained in the preceding paragraphs are incorporated herein.

43.     Ms. Wages has suffered damages as a result of Mr. Walley's actions.

44.     Mr. Walley made a false representation of a material fact when he told Ms. Wages that he would deposit the check into a savings account and then did not do so.

45.     Mr. Walley knew that he would not deposit the check into a savings account.

46.     Mr. Walley intended to induce Ms. Wages to act in reliance upon his misrepresentation.

47.     Ms. Wages justifiably relied upon the misrepresentation and as a result sustained damages.

## SECOND CAUSE OF ACTION – DECEPTIVE TRADE PRACTICES

48.     The allegations contained in the preceding paragraphs are incorporated herein.

49.     Ms. Wages has sustained damages as a result of Mr. Walley's actions.

50.     Mr. Walley used a deception, fraud, or false pretense in connection with the advertisement of services when he told Ms. Wages he would deposit the check into a savings account.

51.     Mr. Walley intended that Ms. Wages rely upon the concealment, suppression, or omission.

52.     Mr. Walley's conduct was a proximate cause of Ms. Wages's damages.

## THIRD CAUSE OF ACTION – CONVERSION

53.    The allegations contained in the preceding paragraphs are incorporated herein.

54.    Ms. Wages owned and was entitled to possess the proceeds from her father's life insurance policy.

55.    Mr. Walley intentionally took or exercised dominion or control over the proceeds in violation of Ms. Wages's rights.

## FOURTH CAUSE OF ACTION – PUNITIVE DAMAGES

56.    The allegations contained in the preceding paragraphs are incorporated herein.

57.    Mr. Walley knew or ought to have known that, in the light of the surrounding circumstances, his conduct would naturally and probably result in damage, and he continued such conduct with malice or in reckless disregard of the consequences from which malice may be inferred.

58.    Mr. Walley intentionally pursued a course of conduct for the purpose of causing damage.

## LIABILITY OF STATE FARM AUTO

59.    The allegations contained in the preceding paragraphs are incorporated herein.

60.    Ms. Wages reasonably believed that Mr. Walley had authority to act on behalf of State Farm Auto.

61.    Ms. Wages's belief is traceable to the State Farm Auto's manifestations.

## LIABILITY OF STATE FARM LIFE AND/OR STATE FARM ANNUITY

62.    The allegations contained in the preceding paragraphs are incorporated herein.

63.    Ms. Wages reasonably believed that Mr. Walley had authority to act on behalf of State Farm Life and/or State Farm Annuity.

64.     Ms. Wages's belief is traceable to the State Farm Life's and/or State Farm Annuity's manifestations.

## LIABILITY OF STATE FARM BANK

65.     The allegations contained in the preceding paragraphs are incorporated herein.

66.     Ms. Wages reasonably believed that Mr. Walley had authority to act on behalf of State Farm Bank.

67.     Ms. Wages's belief is traceable to the State Farm Bank's manifestations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendants, jointly and severally, awarding damages in the amount of $49,500.00, plus prejudgment interest beginning August 3, 2005 until the time of judgment at the rate of 7% per annum, plus lost wages in the amount of $35,000.00, plus punitive damages in the amount of $253,500.00, for a total of $338,000.00, with post-judgment interest to accrue at the rate of 10% per annum, along with such other and further relief as this Court may deem just and proper.

Respectfully Submitted,
Rachel (Johnson) Wages

By:

TAYLOR & TAYLOR LAW FIRM, P.A.
Andy Taylor, Ark. Bar No. 2005147
Tasha Taylor, Ark. Bar No. 05148
124 West Capitol Ave.
Suite 1805
P.O. Box 629
Little Rock, Arkansas 72203-0629
Phone:   501-246-8004
Fax:      501-246-8009
Email:   Andy@TaylorLawFirm.com

# Exhibit A



NEW Address: 106 Brown St. ~~201 Rector Heights Dr.~~, Hot Springs, AR 71913



EXHIBIT

# Exhibit B

08/05/2011 16:00 FAX 00000000000          STATE FARM CLAIMS                           ☒ 053/023

6/3/2011                                   State Farm Bank® – About State Farm B...

- Skip To Content
- Skip To Global Navigation
- Skip To Search Box

# About State Farm Bank

Bank with a company you already know and trust! State Farm Bank® offers convenience, security, and competitive rates on a wide range of products.

## Our History

State Farm Bank received formal approval for a thrift charter from the Office of Thrift Supervision (OTS) in November 1998. Our focus is on consumer-oriented financial products, complementing State Farm's insurance focus on personal lines. State Farm Bank is a nontraditional financial institution and doesn't have branch offices. The bulk of direct customer interaction and product assistance is provided by State Farm Agents, augmented by a telephone call center, the mail, and the Internet.

State Farm Bank offers a wide variety of deposit, loan, and financial card accounts to help meet your needs.

## News & Updates

At State Farm Bank, we are continually working on enhancing our products and services to help our customers have the best possible experience, using the latest functionality available. State Farm Bank is excited to share some of our recent spotlight announcements and news.

### State Farm Bank® MyTime Deposit™ Comes to Android

October 14, 2010
With the newest version of the State Farm® Pocket Agent™ Android app, State Farm Bank customers join iPhone customers in being able to deposit checks into their State Farm Bank deposit account directly from their phones.

### Mobile Check Deposit Available for iPhone

August 3, 2010
State Farm Bank is excited to be one of the first banks in the country to offer MyTime Deposit™, and is committed to further development of cutting-edge services for our customers.

## Related Links

- State Farm Pocket Agent™

## Related Content

- Checking
- Savings
- Credit Cards
- Loans
- Gift Cards

**MyTime Deposit™:** Make deposits anytime, anywhere!

© 2010, State Farm Mutual Automobile Insurance Company. Home Office, Bloomington, Illinois

# Exhibit C

MAY-20-2010 10:07A FROM:STROOPE TIRE INC.    1(501)6245487        TO:15018432335        P.1

501-374 892b



ATTN.
PAUL

**BEFORE THE INSURANCE COMMISSIONER
FOR THE STATE OF ARKANSAS**

IN THE MATTER OF
TIMOTHY WALLEY, LICENSE NO. 12541
TIM WALLEY INSURANCE AGENCY, INC.
LICENSE NO. # 248733            A.I.D. NO. 2010- 0 5 8

**EMERGENCY LICENSE SUSPENSION ORDER**

On this day the emergency matter of Timothy Walley ("Respondent"), came before Jay

Bradford, Arkansas Insurance Commissioner ("Commissioner"). The Arkansas Insurance

Department ("Department") was represented by Ashley Fisher, Associate Counsel.

**FINDINGS OF FACT**

From the facts before the Commissioner, it is found:

1.      The Commissioner has jurisdiction over the parties and subject matter pursuant to

Ark. Code Ann. § 23-61-103 and the authority to issue emergency license suspensions under

Ark. Code Ann. § 23-64-216(e), § 23-64-512(a).

2.      Respondent is currently licensed in Arkansas as a resident producer agent.

Respondent is licensed as a health and accident, property, casualty, life, marine, and surety agent.

Respondent holds Arkansas license number 12541 and has been licensed with the Department

since April 23, 1987. Respondent's address of record at the Department is #3 Darrin Drive,

Little Rock, AR 72223.

3.      The Department received information from State Farm concerning the

circumstances that caused Respondent to resign his appointment. In particular, State Farm

reported that they conducted an audit of Respondent's premium fund account. The audit found the following items of concern: personal checks that were returned for insufficient funds, personal checks used for customer payments, a failure to balance the account in a timely fashion, deposits to the banks that were short funds, deposits not made on a regular basis and policies that were entered with no corresponding deposits.

4. On September 25, 2009, Respondent was given a check in the amount of $630 in cash by customer Ira Watkins for auto policies. These funds were placed into a personal account rather than depositing it into his premium fund account. This failure to turn over the funds to State Farm caused the consumer's policies to be out of force for one month.

5. Consumer Fannie Burks appeared at the Department as a referral from the Securities Department. Ms. Burks brought information with her that showed the following:

a. That on February 7, 1999, she and her husband gave to Respondent an investment of $100,000 at an interest rate of 8.5% to be paid monthly for $708.33.

b. An undated document stating that in consideration of $160,000, an agreement was made between Theo and Fannie Burks and Tim Walley that the Burks' would receive 9.75% interest payments each month payable on the 13th of each month. The agreement was to expire on October 15, 2007 and the principal would be paid within 15 days of the expiration. In the event of Respondent's death, the Burks were to be the beneficiaries of an insurance policy held by Walley.

c. An undated document with Theo and Fannie Burks agreeing that "in consideration of an investment of $150,000, the interest rate of 9.75%", the Respondent would pay $1218.75 on the 7th of each month beginning November 7, 2000 and ending on October 7,

2

2001. The interest rate was "guaranteed for that period of one year." A surrender charge of 5% was to be deducted if the investment was surrendered before October 7, 2001.

      d.     Undated document that states "[I]n consideration of $260,000.00 an agreement is made between Theo and Fannie Burks and Tim Walley Insurance Agency, Inc," that the Burks' would receive an interest rate of 10.00%; or $2333.33. The amount was to be paid on the 15th of each month. The agreement was set to expire on or about October 15, 2007. The agreement states that "a one time payment of $260,000 will be paid to Theo and Fannie Burks within 21 days of that date." The agreement further stated that "In the event of Tim Walley's death before the above stated date, Theo and Fannie Burks are the beneficiaries of policy 1906-7821 in the amount of $260,000 . . . ."

      e.     May 1, 2007 document that states "in consideration of $360,000 an agreement is made between Fannie Burks and Tim Walley Insurance Agency, Inc." for Ms. Burks to receive an interest rate of 10.00% or $2333.33 on the 15th of each month and $825 on the first day of each month. The agreement was to expire on October 30, 2008 wherein a one time payment of $360,000 would be made to Ms. Burks within 10 days of that date.

      f.     Ms. Burks issued a statement on September 2, 2009 to Respondent stating that she wished to surrender her investment of $460,000 on December 31, 2009 without penalty.

      g.     A December 16, 2009 form stating that Ms. Burks received "from Tim Walley a sum of $3800.00 which is interest payments for 12/1/09 and 12/15/09". This document was signed by Ms. Burks and Tim Walley and notarized.

      h.     A December 15, 2009 form that states "I wish to withdraw "$100,000.00. I also realize there may be penalties and interest. These amounts will be determined once the

funds and [sic] been withdrawn. This will leave a balance of $360,000.00 owed to me from Tim Walley." This document was signed by Fannie Burks and Tim Walley. It was also notarized.

  i.  A February 7, 2010 letter from Tim Walley stating; "The money that you and Theo entrusted to me has been used for the following since 1998:

    1.  Used funds to build an insurance business

    2.  Used funds to build building with a value of $700,000.00

Options:

    1.  Continue to receive interest payments for life

    2.  Liquidate office and discontinue receiving interest payments

    3.  Office is currently for sale

    4.  Withdraw $100,000 that you requested and reduce the interest payment to 5%

    5.  At your death the $460,000.00 would be distributed to heirs as previously stated

    6.  Reinstate life policy on Fannie that premium would be paid by Tim Walley and insure that the funds would be available upon your death

Since 1998, over $350,000 in interest has been paid to Theo & Fannie Burks."

This document was signed by Respondent and notarized.

  j.  One of the "interest" payments issued by Respondent, dated 2/18/10, and in the amount of $2655.00, was returned as "not sufficient funds".

  k.  Respondent has ceased making payments to Ms. Burks.

4

5.      Information from Respondent's appointing insurer, State Farm, indicated the following:

a.      ˙Respondent accepted money from consumers Dalton and Betty Beaty on May 15, 2006, May 22, 2007 and October 8, 2007 in the amounts of $250,000, $350,000.00 and $30,000 respectively.  The consumers hold a mortgage on Respondent's office building (third in line).

b.      Checks were written on the State Farm Bank Benefits Management Account of Rachel Johnson and made payable to Respondent for $50,000 on August 3, 2005; on the State Farm Bank Benefits Management Account of Chad Johnson for $50,000.00 on July 28, 2005; and a check written by Mr. Johnson and made payable to Respondent for $15,000 (this transaction indicated a "CD" notation on the memo line".  State Farm investigations revealed that, with regard to Ms. Johnson's check, it was to be placed into a savings account that would pay 7% interest.  There was no paperwork provided and many of the "interest checks" paid out by Respondent were returned "non-sufficient funds".

c.      State Farm investigators also found evidence that an ˙additional seven checks with a total of $123,800 were written to Respondent indicating various investment activities by consumer William Don Smith from August 2004-February 2007.  Another five checks totaling $43,000 were deposited into Respondent's account between March and October 2003.

## CONCLUSIONS OF LAW

From the Findings of Fact contained herein, the Commissioner concludes as follows:

5

6.      The Respondent is in violation of Ark. Code Ann. §23-64-216(a) (1) which provides that a license may be suspended or revoked for violation of any of the causes listed in Ark. Code Ann. § 23-64-512.

7.      The Respondent is in violation of Ark. Code Ann. § 23-64-512(a)(2) which provides that a license may be suspended or revoked for violating any insurance laws, or violating any regulation, subpoena or order of the commissioner or of another state's insurance commissioner.

8.      The Respondent is in violation of Ark. Code Ann. § 23-64-512(a)(7) which provides that a license may be suspended or revoked for having admitted or been found to have committed any insurance unfair trade practice or fraud.

9.      The Respondent is in violation of Ark. Code Ann. § 23-64-512(a) (8), which provides that a license may be suspended or revoked for using fraudulent, coercive, or dishonest practices, or demonstrating incompetence, untrustworthiness or financial irresponsibility in the conduct of business in this state or elsewhere. By taking money from customers, representing them as "investments", using them as personal funds, having checks returned as "non-sufficient funds" and failing to make all payments as agreed, Respondent has shown incompetence, untrustworthiness and financial irresponsibility.

10.     The Respondent is in violation of Ark. Code Ann. § 23-66-501(4)(d), which provides that it is a fraudulent insurance practice to embezzle, abstract, purloin, or convert moneys, funds, premiums, credits, or other property of an insurer, reinsurer, or person engaged in the business of insurance.

6

11.     Ark. Code Ann. §23-64-223, which provides that an agent who collects money in his capacity as a licensee will act in a fiduciary capacity and remit the money to the person entitled thereto.

12.     At the upcoming hearing, the Department seeks administrative penalties and sanctions, up to and including revocation of the Arkansas insurance licenses of Respondent based on the above allegations.

**IT IS THEREFORE ORDERED AND ADJUDGED, as follows:**

1.     Due to the gravity of the allegations and averments, it is found that a public emergency exists for the immediate suspension of Respondent's licenses.

2.     Pursuant to Ark. Code Ann. §§ 23-64-216(e), any and all licenses issued by the Department, whether acquired by Respondent, for being a broker, agent, agency, solicitor, or consultant in this State, are hereby suspended, pending a promptly instituted hearing on the above matter. Respondent's failure to appear at the administrative hearing will prompt a recommendation to the Commissioner and the hearing officer to immediately revoke all insurance licenses issued to Respondent.

3.     The Department shall notify Respondent's appointing insurance companies of this action pursuant to Ark. Code Ann. § 23-64-217(a)(3).

4.     The Department reserves the right to amend and/or supplement the facts contained in this Order to include additional violations of state law, with notice to Respondent.

5.     A Notice of Hearing is enclosed. At the Hearing, the Department will seek to revoke all insurance licenses of Respondent based on the above allegations.

MAY-20-2010 10:14A FROM:STROOPE TIRE INC.   1(501)6245487   TO:15018432335   P.1

IT IS SO ORDERED THIS _13th_ DAY OF MAY, 2010.

JAY BRADFORD
INSURANCE COMMISSIONER
STATE OF ARKANSAS

8